UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **MAPLE HEIGHTS CITY SCHOOL** | ) | **CASE NO. 1:14CV1033** |
| **BOARD OF EDUCATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **JUDGE CHRISTOPHER A. BOYKO** |
| | ) | |
| **Vs.** | ) | |
| | ) | |
| **A.C. Individually and on behalf of A.W.** | ) | **OPINION AND ORDER** |
| | ) | |
| **Defendant.** | ) | |

**CHRISTOPHER A. BOYKO, J:**

This matter is before the Court on both Petitioner's and Respondent's appeals of

certain rulings of  the State Level Review Officer ("SLRO").   These appeals involve A.C.'s

Individualized Education Program ("IEP") as required under the Individuals with Disabilities

Education Act ("IDEA").   For the following reasons, the Court affirms the decisions of the

SLRO in all respects.

"The purpose of the IDEA is to give children with disabilities a free appropriate public

education designed to meet their unique needs."   *Deal v. Hamilton Cty. Bd. of Educ.*, 392

F.3d 840, 853 (6th Cir. 2004), aff'd sub nom. *Deal v. Hamilton Cty. Dep't of Educ.,* 258 F.

App'x 863 (6th Cir. 2008) (citing 20 U.S.C. §§ 1401(25), 1412).   Pursuant to a school

district's obligations to provide a free appropriate public education ("FAPE"), school districts receiving funds under the IDEA are required to establish an IEP for each child with a disability.  *Knable ex rel. Knable v. Bexley City Sch. Dist.,* 238 F.3d 755, 762 (6th Cir.2001) (citing 20 U.S.C. § 1414(a)(5)).  The IEP must "contain a specific statement of the child's current performance levels, the child's short-term and long-term goals, the educational and other services to be provided, and criteria for evaluating the child's progress." *Id.* at 763 (citing 20 U.S.C. § 1401(a)(20)).

"The IDEA provides a process through which parents who disagree with the appropriateness of an IEP can seek relief.  The process begins with a complaint to the school district, followed by a due process hearing at which parents are able to voice their concerns to an IHO of the state educational agency, as determined by state law." *Knable,* 238 F.3d at 763 citing 20 U.S.C. § 1415(b).  "Any party may appeal the result of this hearing to an SLRO." *Knable,* 238 F.3d at 763 *citing* 20 U.S.C. § 1415(c).  "Finally, any party aggrieved by the result of the hearing held before the SLRO may bring suit in the appropriate state court or federal district court."  *Knable,* 238 F.3d at 763 citing 20 U.S.C. § 1415(e)(2).

### Statement of the Facts

A.W. was a fourteen year old female student of Maple Heights High School ("District"). (Tr. Pg. 31).  A.W. exhibited behavioral issues from a very young age and she has exhibited poor behavior while in educational settings.  (Tr. 34-36).  Throughout her educational career, A.W. has been diagnosed with several educational and behavioral disabilities.  (Tr. Pg. 33, 40; 41-43).  However, as of the time of the State Level Review Officer's ("SLRO") Hearing, it was agreed that A.W. suffered from emotional disturbance

2

("ED") and was therefore eligible for special education services. (SLRO pg. 9).

A.W. first moved into the District at the end of the 2009-2010 school year.[1]  (Tr. 69).  At this time A.W. was enrolled in private placement at Educational Alternatives (EA).  (Tr. 811).  EA is a day treatment facility for students with emotional and behavioral concerns.  (Tr. 811).  EA is a private facility that contracts with school districts, including the District, to provide educational services to students.  (Tr. 872).

**2010-2011 School Year**

A.W. began her 2010-2011 school year at EA but expressed an interest in transferring to the regular public school.  Throughout this school year, A.W.'s Individualized Education Plan ("IEP") was amended several times, most notably during the Spring of 2011.  In March 2011, A.W.'s IEP was amended to provide for the transition to the District middle school.  (Tr. 867-868).  The District, A.W. and A.W.'s parent agreed to this amendment and eventual transition.  The transition started on March 21, 2011 and involved attending the District school in the morning and being transported to EA in the afternoon.  (Tr. 95).

At the end of the 2010-2011 school year, A.W.'s parent expressed her desire to wait until the following school year to determine whether A.W. would attend the District full time.  (Tr. 100-02).  After an IEP meeting without A.W.'s parent, A.W.'s mother filed a complaint with the Ohio Department of Education ("ODE") and the ODE told the District to reconvene the IEP meeting.  (Tr. 101-03).  At this IEP meeting it was determined that A.W. would remain at EA part-time and would attend the District part of the time.

**2011-2012 School Year**

---

[1]   The Court notes that A.W. transferred out of Maple Heights School District in the 2014-2015 school year.

A.W. began her 2011-2012 school year in partial transition status and made a full transition to the District in October 2011.  (Tr. 116).  At the District, A.W. was placed in a resource room with therapeutic support pursuant to her February 2011 IEP.  During the Fall of 2011, A.W. began exhibiting behavioral problems.  (Tr. 1736-65).  She acquired seven behavioral write-ups from October 21, 2011 to December 14, 2011.  Additionally, A.W. was suspended for brief periods on three occasions during this time frame for behavior related outbursts.  (P.Ex. 23).  A behavior intervention plan ("BIP") was prepared for A.W. to help alleviate these behaviors.  (Tr. 1760).

A.W.'s IEP team reconvened in February 2012 and prepared A.W.'s new IEP.  (Tr. 125).  A.W.'s IEP allowed her to move out of the resource room for science class and her specials (art, music and gym). (See Feb. 2012 IEP and Settlement Agreement para. 5).  It

In the summer of 2012, the District met to discuss A.W.'s evaluation team report ("ETR") that was conducted throughout the summer.  During a three hour meeting, the team reviewed A.W.'s ETR findings and had an extensive discussion regarding her eligibility determination.  The team concluded that A.W.'s behaviors did not constitute ED under the Individuals with Disabilities Education Act.  Rather, they concluded that her behaviors fell under social maladjustment.  Due to this finding, the ETR team determined that A.W. was no longer qualified as a child with a disability and was thus no longer eligible for special education services.  A.W.'s mother disagreed with this finding and filed a Due Process Complaint on August 24, 2012.  (Tr. 129).  While this complaint was going through the administrative process, the District continued to provide A.W. with special education services.

**2012-2013 School Year**

A.W. continued to exhibit poor behavior while in the resource room including: impulsivity, excessive talking, problems interacting with peers, verbal aggression, bouts of agitation, defiance, arguing with peers and leaving the class without permission.  (Tr. 657-58).  After this continued for several weeks, A.W.'s resource room teacher no longer agreed that A.W. did not qualify for special education services.  (Tr. 670-72).  A.W.'s resource room teacher began charting A.W.'s behavior to document her concerns.

On October 2, 2012, the District discovered that A.W. possessed marijuana on school grounds in violation of the school's Code of Conduct.  (P.Ex. 31; 35).  A.W. was immediately suspended for ten days.  On October 16, 2012, a manifestation determination review ("MDR") meeting was convened in order to determine whether A.W.'s disabilities had a direct and substantial relationship to the drug possession.  (Tr. 682-83).  While the District concluded that the drug possession was not a manifestation of A.W.'s disability, the IHO concluded that A.W.'s parents proved, by a preponderance of the evidence, that the drug possession was a manifestation of A.W.'s disability.  The SLRO affirmed the IHO's determination that A.W.'s drug possession was a manifestation of A.W.'s disability.

During A.W.'s expulsion she received one-on-one small group instruction at the Maple Heights Library.  (Tr. 684-85).  During this time, A.W. generally exhibited good behavior and stayed on task.  (Tr. 1873; 1889-1890).

On December 14, 2012, A.W.'s mother and the District entered into a Settlement

5

Agreement resolving the issues of the Due Process Complaint filed in August 2012.  (Tr. 165, 169).  The Settlement Agreement stated that A.W.'s qualifying disability was Emotional Disturbance.  (Tr. 171).  Further, it stated that A.W. would be placed in an age-appropriate small group resource room with participation in science, art, music and physical education classes with mainstreamed students.  Additionally, the agreement stated that A.W. would receive twenty-four hours of one-on-one services, two hours in length per-day.  Finally, the Settlement Agreement expressly resolved all outstanding claims asserted in the August 2012 Complaint, but did not encompass any claims that may have arisen since the filing of the Complaint on that date.

In January 2013, A.W. returned to the District and was in Mr. Green's resource room. She continued to receive services pursuant to her IEP.  Between January 22, 2013 and February 21, 2013, the District asked Dr. Swartz, a behavioral specialist, to prepare a functional behavior assessment ("FBA") and a behavior intervention plan ("BIP") for the impending IEP meeting at the school.

On February 21, 2013, A.W. was caught stealing another student's iPod and was subsequently suspended.  On March 4, 2013, the school held an MDR meeting in order to determine whether A.W. disability's had a direct and substantial relationship to the iPod theft. While the District determined that the iPod theft was not a manifestation of A.W.'s disability, the IHO held that A.W.'s parents proved by a preponderance of the evidence that the iPod theft was a manifestation of A.W.'s disability.  Additionally, the SLRO affirmed the IHO findings.

**2012-2013 IEP**

6

The December 2012 Settlement Agreement provided that the current IEP would be extended past its expiration time of January 2013 and that the parties could agree to any necessary extensions.  However, this did not happen.  (Tr. 1706).  Additionally, the Settlement Agreement provided that an IEP meeting would occur by February 12, 2013, however, this did not occur either.  It was not until March 11, 2013, that the District convened an IEP meeting.

**Expert—Dr. Sargent**

Dr. Sargent, a behavioral specialist and educational consultant, was hired by the District to help assess the quality of the programming at the District as it pertained to A.W.  Because Dr. Sargent was not qualified to diagnosis a mental health or medical disorder, she was unable to state an opinion about A.W.'s diagnosis.

Dr. Sargent performed an evaluation for the District which included:  reviewing A.W.'s records, reviewing external evaluations and reports pertaining to A.W.; observing A.W. at the library for an hour and a half and observing the resource room.  However, Dr. Sargent did not interview A.W.'s mother, A.W. or contact Dr. Swartz for a report.

When reviewing A.W.'s IEPs, Dr. Sargent concluded that A.W. was making progress on her IEP goals.  Dr. Sargent also reviewed data sheets provided by the teacher of the resource room.  These data sheets contained numerous mathematical errors, all of which went unnoticed by Dr. Sargent when she concluded that the data showed A.W. was making progress.

Based on this evaluation, Dr. Sargent determined that the decision of the MDR team regarding the iPod incident was appropriate.  Dr. Sargent stated that the behavior was not a

manifestation of A.W.'s disability.

The IHO had an opportunity to observe Dr. Sargent and found that Dr. Sargent's demeanor, her failures to identify the errors in calculating the data in A.W.'s behavior chart, and to accurately describe the trends depicted by that data, led the IHO to discredit her testimony.

**Expert—Dr. Jensen**

Dr. Jensen, a pediatric psychologist at the Cleveland Clinic, performed a psychological evaluation of A.W. and issued a report. (Tr. 932). Her evaluation spanned from March 2013 until May 2013. In conducting her report, Dr. Jensen interviewed A.W.'s mother, interviewed A.W., tested A.W., interviewed educators, observed A.W.'s resource room at the District, observed A.W. at her home instruction in the library, spoke with Dr. Swartz and reviewed extensive school records as well as external evaluations and reports pertaining to A.W.

Dr. Jensen concluded that A.W. had several significant mental illnesses and her overall functioning was impaired. Based on these findings and her extensive experience evaluating children and interpreting children's psychological tests, Dr. Jensen opined that the behaviors leading to A.W.'s two disciplinary incidents in October and February were linked to her disability. The IHO gave due weight to Dr. Jensen's testimony and stated that Dr. Jensen had very impressive professional credentials and she testified confidently with a demeanor that demonstrated sincerity, candor, analytical skills and honesty. Further, the IHO observed Dr. Jensen to be a very credible witness. The IHO found that Dr. Jensen's testimony established that, due to A.W.'s disabilities, there can be times when A.W. is unable

8

to stop her actions even though A.W. knows her conduct is wrong. Dr. Jensen further stated that "it is very unlikely that A.W.'s disability did not play a significant role in her behavior. (Tr. 1074). Finally, Dr. Jensen established that A.W.'s mental illnesses are so significant that A.W.'s overall functioning is very impaired.

### Standard of Review

A party that is aggrieved by the findings and decision made by a state educational agency regarding an IDEA claim has the right to bring a civil action in a district court of the United States. *See* 20 U.S.C. § 1415(i)(2)(a). The district court shall receive the records of the administrative proceedings, hear additional evidence at the request of a party, and, based on the preponderance of the evidence, grant appropriate relief. 20 U.S.C. § 1415(i)(2)(c). This case is before the Court upon the administrative record with the addition of the August 2012 Due Process Complaint filed by A.C., which was not initially included in the administrative record.

When a claim is brought under IDEA, the Court must afford due weight to the state administrative proceedings. *Bd. of Educ. of Hendrick Hudson Sch. Dist. v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). The Sixth Circuit has explained that "a district court is required to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings." *Knable ex rel. Knable v. Bexley City Sch. Dist.,* 238 F.3d 755, 764 (6th Cir.2001)). This standard of review is referred to as "modified" *de novo. See, e.g. Nack ex rel. Nack v. Orange City Sch. Dist.,* 454 F.3d 604, 609 (6th Cir.2006) (citing *N.L. ex*

*rel. Mrs. C. v. Knox County Sch.,* 315 F.3d 688, 692 (6th Cir.2003). "In a case involving a motion for summary judgment, the court should still apply modified *de novo* review, but must ensure that there are no genuine issues regarding the facts essential to the hearing officer's decision." *Burilovich v. Bd. of Educ. of Lincoln Consol. Sch,* 208 F.3d 560, 560 (6th Cir.2000).

In reviewing an IDEA claim, the Court conducts a two-fold inquiry: (1) whether the procedural requirements outlined in the IDEA were met; and (2) if the IEP was developed according to these procedural requirements, whether it is "reasonably calculated to enable the child to receive educational benefits." *Rowley,* 458 U.S. at 206–207. When reviewing procedural matters, the Court must strictly review the IEP process for compliance, but need not necessarily invalidate an IEP for a mere technical deviation from the prescribed procedures. *See Dong ex rel. Dong v. Bd. of Educ. of the Rochester Cmty. Sch.,* 197 F.3d 793, 800 (6th Cir.1999)). Notably, greater deference is given to the school district's IEP determination when the Court finds that the procedures outlined in the IDEA have been followed. *See Id.*

When considering substantive measures, the Sixth Circuit explained in *Deal v. Hamilton County Board of Education,* that they are treated differently:

> Although reviewing courts must not "simply adopt the state administrative findings without an independent re-examination of the evidence," *Doe ex rel. Doe v. Metropolitan Nashville Public Schools,* 133 F.3d 384, 387 (6th Cir.1998), neither may they "substitute their own notions of sound educational policy for those of the school authorities which they review," *Thomas v. Cincinnati Board of Education,* 918 F.2d 618, 624 (6th Cir.1990) (quoting *Rowley,* 458 U.S. at 206).

392 F.3d at 849. "The amount of deference the Court affords to substantive state

10

administrative findings is correlated to the degree to which the findings are based on educational expertise.  More weight is afforded to determinations in which educational expertise is relevant, but less weight is afforded to determinations in which educational expertise is not relevant, because the district court judge is just as well situated as the administrator to make such determinations."  *T.J. v. Winton Woods Sch. Dist.*, No. 1.10-cv-847, 2013 WL 1090465 (S.D. Ohio Mar. 15, 2013); *See McLaughlin v. Holt Public Sch. Bd. of Educ.,* 320 F.3d 663, 669 (6th Cir.2003).  When educational expertise is essential to the findings of a state administrative agency, the court has an obligation to afford special deference to such findings.  *Nack ex rel. Nack,* 454 F.3d at 609 (citing *N.L. v. Knox Cty. Sch.,* 315 F.3d 688, 692 (6th Cir.2003)).

A reviewing court will necessarily defer to administrative rulings.  When reviewing the findings of both an IHO and a SLRO, the Court must defer to the SLRO's decision.  *See Burilovich,* 208 F.3d at 567 (citing *Renner v. Bd. of Educ. of Pub. Sch. of City of Ann Arbor,* 208 F.3d 560, 641 (6th Cir.1999)).  However, while the court must give the SLRO deference in matters requiring educational expertise, the Court will not "second guess" credibility determinations made by the IHO, who was best situated to assess the credibility of testifying witnesses.  *B.H. v. W. Clermont Bd. of Educ.,* 788 F.Supp.2d 682, 693, (S.D.Ohio 2011) (citing *Bd. of Educ. of the City Sch. Dist. of the City of Cincinnati v. Wilhelmy,* 689 F.Supp.2d 970, 987 (S.D.Ohio 2010)).

<u>Law and Argument</u>
<u>The District's Assignments of Error</u>

1. **Assignment of Error 1: The SLRO erred in concluding and deciding that the Parent met her burden to prove by a preponderance of the evidence that the**

11

Student's conduct that was the subject of the October 16, 2012 manifestation determination was a manifestation of the Student's disabilities. The SLRO improperly disregarded and gave no weight to documentary record evidence, witness testimony, and expert testimony in reaching this decision. The SLRO's decision is contrary to both the law and evidence adduced at the hearing.

2. **Assignment of Error 2: The SLRO erred in concluding and deciding that the Parent met her burden to prove by a preponderance of the evidence that the Student's conduct that was the subject of the March 4, 2012 manifestation determination was a manifestation of the Student's disabilities. The SLRO improperly disregarded and gave no weight to documentary record evidence, witness testimony and expert testimony in reaching this decision. The SLRO's decision is contrary to both the law and the evidence adduced at the hearing.**

The SLRO did not err in concluding that A.W.'s marijuana possession and iPod theft were a manifestation of her disability. The District argues that the SLRO erred in concluding that A.W.'s disciplinary transgressions, occurring in October and February, were a manifestation of her disability. Particularly, the District argues that the SLRO failed to give any weight to documentary record evidence, witness testimony and expert testimony in reaching this decision. The District supports their argument by citing a number of cases, none of which are controlling authority in this jurisdiction, stating that "significant weight should be afforded to the educators themselves who have consistent contact with the student." (District's Brief at 25). However, the Sixth Circuit has made it clear "that deference is due to the IHO." *Woods v. Northport Public Sch.*, 487 Fed. Appx. 968, 974 (6th Cir. 2012). The Sixth Circuit has previously stated that "the IHO is a representative of the state presumed to have both the educational expertise and the ability to resolve questions of educational methodology that the federal courts do not have." *Deal,* 392 F.3d at 865. In *Woods,* the Sixth Circuit Court stated "the district court was not in a position to give deference to the Northport

12

professionals and the IHO, whose findings are in conflict."  *Woods*, 487 Fed. Appx. at 974.

*See, e.g. Burilovich,* 208 F.3d at 565 (stating that "courts must give 'due weight' to the state

administrative proceedings."); *Renner v. Bd. of Educ. of Pub. Schs. Of City of Ann Arbor*, 185

F.3d 635, 641 (6th Cir. 1999) (stating "due weight shall be given to [administrative]

proceedings in actions brought under the IDEA.").  Similarly, in the case at bar the IHO was

presented with conflicting findings from the District and Dr. Jensen.  The IHO determined the

credibility of these determinations and ultimately sided with Dr. Jensen, providing ample

support and justification for doing so.

Upon receiving the appeal to the SLRO, the SLRO applied a de novo standard of

review.  The SLRO noted that in matters of assessing witness credibility and demeanor,

deference must be given to the trier of fact, in this case the IHO.  *Bd. of Educ. of the City Sch.

Dist. of the City of Cincinnati v. Wilhelmy*, 689 F.Supp.2d 970 (S.D. Ohio 2010).  Regarding

the subject of the two assignments of error, the SLRO stated in her decision:

> In reaching his decision, the IHO gave greater weight to the opinions of Parent's
> expert than the District expert.  Under IDEA and the implementing federal and state
> regulations, the IHO is given wide latitude in governing the due process hearing.  It is
> within the IHO's authority to make evidentiary rulings and decisions.  *Stancourt v.
> Worthington City Sch. Dist. Bd. of Educ.*, 164 Ohio App.3d 184, 205 (2005)
> ("Generally speaking, [a] hearing officer has broad discretion in accepting and
> rejecting evidence and in conducting the hearing in general.").  Similarly, the IHO was
> well within his discretion to give weight to certain experts' opinions and not to give
> weight to the opinion of other experts.
>
> The IHO committed no error in assessing the merits of these experts and giving
> greater weight to the input from Dr. Jensen and Dr. Swartz.  In his decision not to give
> weight to Dr. Sargent's testimony, he discredited her testimony for many reasons.
> Most importantly, the IHO determined that Dr. Sargent was not credible, including his
> observation of her demeanor, in his determination not to give weight to Dr. Sargent's
> opinion. Credibility determinations must be accorded due deference because the fact-
> finder is in the best position to make such determinations.  *Stancourt v. Worthington*

*City Sch. Dist. Bd. of Educ.*, 841 N.E.2d 812, 823 (Ohio App.Ct. 10th Dist. Franklin Cty., Oct. 27, 2005).

The IHO further discredited Dr. Sargent's testimony because she did not conduct any evaluation assessing or testing of the Student, her conclusions and opinions were based on interviews with District personnel only, not Parent or Student.  He concluded that she had made assumptions about Student's behavior during the 2012-2013 school year based on records that were incomplete and contained faulty data and when at least one teacher had testified that all of her Student's behavioral observations had not been recorded.  Further, Dr. Sargent was not qualified to make diagnoses.  The IHO's ruling was supported by competent credible evidence.

The IHO's ruling did not rise to an abuse of discretion.  Even if the IHO had not totally disregarded Dr. Sargent's testimony on credibility grounds, her testimony was so diametrically opposed to Dr. Jensen's as to make it difficult to reconcile the two.  Dr. Sargent supported the District on every point and painted a very rosy picture of Student and the District's programming.  She thought Student had no major issues, and her IEP goal and benchmarks were appropriate and believed that Student was making progress on her goals in both her resource room and home instruction (despite the significant conduct evidence to the contrary).

Dr. Jensen, on the other hand, after a much more thorough review, thought Student had major psychological issues now and predictably into the future, that it is impossible for an individual of this age to adequately learn the required content expected at a middle school level when not in school, that the alternative setting does not provide the same intensity and breadth of instruction, that expelled students are at a significantly higher risk for the number of negative experiences, and although she would gain some skills in some areas in her one-on-one instruction, that doesn't predict success in a school setting where she is exposed to a much broader range of and variety of interactions, types of conflict and "annoying" actions that have traditionally been a part of her inappropriate behaviors.  The IHO did not adopt all of Dr. Jensen's opinions.  He did not follow her recommendation of placement at a more structured and controlled educational program.

The scope of Student's disabilities required a clinical psychologist or another mental health professional capable of making diagnoses, to properly shed light on the scope of Student's disabilities, and, more importantly, how these symptoms impact her conduct. Dr. Jensen had these qualifications and concluded that the drug possession behavior was strongly linked to her emotional disabilities.  She took issue with the school's position in the MDR meeting where the focus was erroneously on whether Student's actions were "planned" and "purposeful" as well as "willful" and thus not related to her disability.  Based on the research on mental health issues, impairments that Student has cannot be "seen."  Her moment-to-moment decision-making is likely to be frequently distorted, impulsive, and without consideration of consequences for herself or others. Further, she is less likely to benefit from traditional consequence and

14

punishment parameters than "typical" students.

(SLRO's Decision, pages 36-38).

Accordingly, it has been held that a court must afford the SLRO deference where educational expertise is applied, and it will not "second guess" the credibility determinations made by an IHO who "was in the best position at the due process hearing to assess the credibility of the witnesses who testified." *Bd. of Educ. of the City School Dist. of the City of Cincinnati v. Wilhelmy,* 689 F.Supp.2d 970, 987 (S.D.Ohio 2010).

Therefore, the Court must give deference to the findings of both the SLRO and the IHO. Giving deference to these administrative bodies, the Court finds that the SLRO did not err in giving deference to the IHO and determining that A.W.'s mother proved by a preponderance of the evidence that both the October and February disciplinary incidents were manifestations of A.W.'s disability.

The District further argues that the SLRO erred in concluding that A.W. was not subject to further discipline or change of placement following her drug possession. The District argues that, pursuant to §1415(k)(1)(G), the school was justified in suspending A.W. for the drug possession regardless of whether or not the possession was a manifestation of A.W.'s disability. §1415(k)(1)(G) states in pertinent part:

(G) Special circumstances

School personnel may remove a student to an interim alternative educational setting for not more than 45 school days without regard to whether the behavior is determined to be a manifestation of the child's disability, in cases where a child—

15

> (ii) knowingly possesses or uses illegal drugs, or sells or solicits the sale of a controlled substance, while at school, on school premises, or at a school function under the jurisdiction of a State or local educational agency:

However, as the SLRO correctly pointed out, the District waived the zero-tolerance policy argument because they did not raise it at the October MDR. (SLRO Decision page 35).  The SLRO noted that during the MDR in October the District did not invoke this provision and therefore they cannot remedy that lapse now.  Therefore, because the District did not raise this provision during the October MDR meeting, they have waived such argument and defense in this proceeding.

Additionally, the IHO *sua sponte* analyzed what the term "knowingly" meant within the statute and held that due to A.W.'s disability she could not "knowingly" possess the drugs.  The IHO therefore concluded that A.W.'s conduct did not fall within the Special Circumstances provision of §1415(k)(1)(G) and thus, the school was not justified in expelling A.W. for fifty-two days for the drug possession.

In coming to this decision the IHO stated:

> The term "knowingly" is defined in Black's law Dictionary as "with knowledge; consciously; intelligently, willfully, intentionally."  (Black's Law Dictionary, Rev'd 4th ed. at 1012).  Dr. Jensen established that the Student's disabilities are so significant that her overall functioning is very impaired, and can be manifested in behaviors that result from fantasy reasoning. (FOF 85, 88).  Dr. Jensen stated that "it is very unlikely that A.W.'s disability did not play a significant role in her" possession of drugs. (Tr. Pg. 1074).  The actions of a child who experience cognitive distortion, acts from fantasy reasoning and whose overall intellectual functioning is very impaired are not intentional, willful, intelligent actions.  The IHO thus finds that the Student did not knowingly possess drugs on the School's premises. (FOF 76).

(IHO Decision page 115).

The SLRO disagreed with the IHO's *sua sponte* analysis of the term "knowingly" and determined that the IHO erred in performing this analysis and erred in determining that "knowingly," in the context of this statute, should be defined using the definition set forth in Black's Law Dictionary. (SLRO page 35).  The SLRO determined that "knowingly" within the meaning of IDEA actually pertains to a student's awareness that he or she is in possession of drugs.  Taking into consideration the intent of the statute and the context of the word "knowingly," the Court is inclined to agree with the SLRO's determination of what "knowingly" means in this context.

However, even though the SLRO disagreed with the IHO's reasoning regarding the IHO's determination that A.W.'s drug possession was a manifestation of her disability because she could not "knowingly possess drugs," the SLRO agreed with the overall conclusion of the IHO, that A.W.'s drug possession was a manifestation of her disability. Therefore, A.W. was not subject to further discipline or change of placement for fifty-two days.

As stated above, the SLRO reasoned that the IHO was within its discretion to find one expert more credible than the other and give that expert's testimony more evidentiary weight. The SLRO deferred to Dr. Jensen's testimony that A.W.'s drug possession was strongly linked to her emotional disabilities. (SLRO page 37).  The SLRO therefore determined that the IHO did not err in adopting Dr. Jensen's opinion that A.W.'s drug possession was a manifestation of her disability, and therefore ruled that an additional fifty-two days[2] of

---

[2]  The statute states that a student may be expelled for up to 45 days for violating this provision. In total A.W. was suspended for 7 days and expelled for an additional 45. The suspension and expulsion ran consecutive to

17

punishment or a change of placement was improper.

Therefore, for the foregoing reasons, the Court affirms the decision of the IHO and SLRO and finds that A.W.'s marijuana possession and iPod theft were manifestations of her disabilities.

    **3.** **Assignment of Error 3: The SLRO erred in concluding and deciding that the Parent met her burden to prove by a preponderance of the evidence that the Student's March 11, 2013 IEP did not provide the Student a FAPE.  (SLRO Decision, p. 54). The SLRO improperly disregarded and gave no weight to documentary record evidence, witness testimony, and expert testimony, including evidence and testimony demonstrating the Student's progress during the relevant time period, in reaching this decision.  The SLRO's decision is contrary to both the law and the evidence adduced at the hearing, and impermissibly shifted the burden of proof.**

The SLRO did not err in concluding that the Parent met her burden to prove by a preponderance of the evidence that A.W.'s March 11, 2013 IEP did not provide her a FAPE. The District argues that SLRO erred when the SLRO found procedural errors in connection with the March 11, 2013 IEP and that A.W. suffered a loss of educational opportunity as a result of a failure to have a proper IEP meeting.

The parents carried the burden of proof in showing procedural errors with the March 11, 2013 IEP.  Review and revision of the IEP is a collaborative project of the IEP team members, which includes parent(s).  *Schaeffer v. Weast* (2005), 126 S.Ct. 528, 532; 20 U.S.C. 1414(d)(1)(B); 34 C.F.R. 300.321(a).  Beyond the fact that the District failed to amend the expired IEP until March 11, 2013, the IEP meeting that did occur on March 11, 2013 exhibited additional problems.

---

each other, totaling a sum of 52 days.

A number of procedural errors occurred regarding the March 11, 2013 IEP. First, A.W.'s IEP expired on January 31, 2013 and the IEP team did not meet until March 11, 2013 to develop a new IEP. The District argues that A.W.'s previous IEP did not expire on January 31, 2013 because the Settlement Agreement provided that both parties "may agree to amend the IEP to permit a further reasonable extension of the IEP expiration date." (Settlement Agreement, Resp. Ex. 1, Section 1, ECF #14-87). However, the parties never "agree[d]" orally or in writing to amend the IEP to permit an extension on the expiration date. The IHO found that the "parties did not execute an agreement to extend the February 1, 2012 IEP's expiration beyond January 31, 2013." (IHO Opinion page 101). The IHO elicited testimony from Ms. Harvey who stated that the February 1, 2012 IEP expired on January 31, 2013 and the IEP did not reconvene until March because A.W.'s mother wanted further reports and evaluations performed. However, Ms. Harvey then stated that this "agreement" to extend the expiration date of the IEP was not in writing and the only reason she believed there was an agreed extension was because of the Special Education Director. Ms. Harvey explicitly stated:

> Q: Who led you to understand that there was an agreement that this IEP would extend beyond January 31st of 2013?
>
> A: Our special ed director.
>
> Q: Okay. So it wasn't a result of your being in a meeting where the agreement was reached?
>
> A: No.

(Tr. Pp. 1418-1419).

Second, the SLRO found that A.C. was not afforded a meaningful opportunity to participate in the IEP meeting.  The SLRO reasoned that the meeting lasted three hours long, there were numerous items discussed and the meeting needed to be continued so that A.C. and the other members of the team could fully participate.  Legally, A.C. had a right to meaningfully participate in A.W.'s IEP meeting.  In *Deal v. Hamilton Cty. Bd. of Educ.* the Sixth Circuit held that merely because the parents were present and spoke at the IEP meeting did not mean that the parent was "afforded adequate opportunity to participate." *Id.* at 858.  In the case at bar, there is little evidence to guide the Court either way to determine the level and meaningfulness of A.C.'s participation.  The SLRO noted that several participants came and went during the meeting and further noted that A.C.'s counsel was present via phone.  The SLRO determined that in order for A.C. to meaningfully participate the meeting needed to be continued to allow full participation by all the key players.  The record reflects that the meeting lasted three hours long, A.C. was present at the meeting, A.C.'s counsel was present via phone conference and the meeting covered the SLP, the FBA, the BIP, the ETR, and the IEP.  Despite this, the SLRO determined that A.C. was denied an opportunity to meaningfully participate.  Because the IHO had the opportunity to hear the testimony of the participants regarding the hearing, including what issues were discussed and the time spent discussing them and who was present when the matters were discussed, the Court will defer to that decision.

Third, the SLRO found that the new IEP drafted on March 11, 2013, was not created in the appropriate manner.  The SLRO stated that "it was also not appropriate to use the prior

year's IEP with added handwritten comments." The Court agrees with the SLRO that the failure to draft a new IEP and instead substitute illegible handwritten notes is a procedural violation.

While there were procedural violations regarding the creation of the March 11, 2013 IEP, a procedural violation of IDEA is not a per se denial of a FAPE. Rather, procedural violations will be considered a denial of a FAPE only if the violations cause substantive harm to the child or the child's parents. *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 765 (6th Cir. 2001). Substantive harm occurs when the procedural violations seriously infringe upon the parent's opportunity to participate in the IEP process. *Id.* Here, the SLRO determined that the procedural violations infringed on the parent's opportunity to participate. Additionally, substantive harm may also occur when a student is deprived of an IEP or suffers a loss of educational opportunity. *Babb v. Knox County Sch. Sys.*, 965 F.2d 104, 109 (6th Cir. 1992). The lack of an IEP from January 31, 2013 until March 11, 2013 and the inadequate drafting of the March 11, 2013 IEP deprived A.W. of an IEP. Furthermore, the disciplinary removals related to A.W.'s disabilities denied A.W. a FAPE. Because of this, A.W. was substantially harmed due to these violations.

Therefore, the Court affirms the determination of the SLRO that the March 2013 IEP denied A.W. a FAPE.

**4.   Assignment of Error 4: The SLRO erred in concluding and deciding that the change of placement to home-based instruction during the 2012-2013 school years, resulting from two expulsions of the student denied FAPE to the Student. The IHO improperly disregarded and gave no weight to the IHO's previous determination, in his Order on the Stay-Put hearing, that the home-based instruction at the library provided educational services to enable the Student to**

> **participate in the general educational curriculum and provided better intervention services and modifications designed to address the Student's behavior violation, and therefore denying the Parent's Stay-Put motion. And, the SLRO improperly disregarded and gave no weight to documentary record evidence, witness testimony, and expert testimony, including evidence and testimony demonstrating the Student's progress during the home-based instruction. The SLRO's decision is contrary to both the law and the evidence adduced at the hearing.**

According to the applicable standard of review, the amount of "due weight" afforded to the administrative findings varies depending on whether such findings are based on educational expertise. *McLaughlin v. Holt Pub. Schs. Bd. of Educ.*, 320 F.3d 663, 669 (6th Cir. 2003). Therefore, "more weight" is due to any "an agency's determinations on matters for which educational expertise is relevant." *Id.*

The Sixth Circuit has stated that an IHO "is a presumed representative of the state presumed to have both the educational expertise and the ability to resolve questions of educational methodology that the federal courts do not have." *Deal*, 392 F.3d at 865. Therefore, the Sixth Circuit has made it clear "that deference is due to the IHO." *Woods v. Northport Public Sch.*, 487 Fed. Appx. 968, 974 (6th Cir. 2012). Thus, the Court will give due deference and "more weight" to the IHO's determination regarding the IHO's findings based on educational expertise concerning A.W.'s change of placement.

The IHO looked to applicable law discussing how to determine whether an IEP is reasonably calculated to afford a student a FAPE. The United States Supreme Court has established a two-prong test for determining whether an IEP provides a FAPE:

> First, has the district complied with the procedures set forth in the Act? And second, is the individualized education program developed through the Act's procedures reasonably calculated to enable the child to receive educational

benefits? If those requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

*Board of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 207 (1982). The IHO correctly stated that A.C. did not contend that the District failed to comply with the procedural requirements put forth in IDEA and therefore, the IHO did not need to perform an analysis on the first prong laid out in *Rowley*.

Regarding Rowley's second prong, the IHO correctly determined that A.W.'s IEP was not reasonably calculated to provide A.W. a FAPE.  IDEA requires a school to provide a FAPE to all children with disabilities.  20 U.S.C. §1400, et seq.; O.A.C. §3301-51-02.  The United States Supreme Court has stated that in order to provide a FAPE, a school must develop and implement an IEP.  That IEP must be appropriate to meet the child's needs and reasonably calculated to enable the child to receive educational benefits.  *Rowley*, 458 U.S. at 182.  The IEP must contain a specific statement of the child's current performance levels, the child's short-term and long-term goals, the educational and other services to be provided and criteria for evaluating the child's progress. 20 U.S.C. §1401(a)(2).

The SLRO did not err in concluding and deciding that the change of placement to home-based instruction during the 2012-2013 school year denied A.W. a FAPE.  The placement of a child inside or outside the general education classroom is a question requiring educational expertise.  *Woods v. Northport Public Sch.,* 487 F. App'x 968, 979 (6th Cir. 2012).  Therefore, more weight must be given to the SLRO's determination.

The SLRO determined that the home-based instruction denied A.W. a FAPE because it did not comply with A.W.'s IEP.  The SLRO noted that the IEP that expired on January 31,

23

2013, provided that A.W. work on one behavior goal and four objectives related to that goal, all of which were related to interactions with other peers an staff.  A.W.'s LRE was the resource room at school.  Therefore, that is where A.W. belonged in order to provide her with a FAPE.  Additionally, A.W. was supposed to attend science in an inclusion classroom and specials with other disabled children.  Ms. White and Ms. Ford could only work on A.W.'s IEP goals to a very limited extent during her home instruction.  The change of placement deprived her of these opportunities.  Finally, although there was evidence of progress on A.W.'s IEP goals, this was not sufficient progress by the time this IEP year concluded.

Finally, the District argues that the IHO contradicted himself when he first determined that home-based instruction was proper during the Stay-Put Hearing but then determined that home-based instruction ultimately denied A.W. a FAPE.  However, the SLRO correctly points out that the IHO conducted a bifurcated hearing, creating a separate evidentiary hearing for both determinations.  The issue before the IHO at the Stay-Put hearing was an interim issue and the issue presented to the IHO at the due process hearing was a final determination. Tthe first issue regarding the Stay-Put hearing is entirely separate from the determination of a FAPE.

Therefore, the SLRO did not err in concluding that A.W.'s 2012-2013 IEP denied her a FAPE and the Court affirms the SLRO determination.

5.  **Assignment of Error 5: The SLRO erred in ordering that 125 hours of compensatory education be provided to the Student.  The SLRO's compensatory education is based on erroneous findings that FAPE was not delivered during the home-based instruction, and thus it was error to order compensatory education where the Student was not entitled to an award of compensatory education.  The SLRO's decision is contrary to law and to the evidence adduced at the hearing,**

**and contrary to the SLRO's own findings and conclusions.**

Because the Court has already ruled that the home-based instruction did deny A.W. a FAPE, the District's assignment of error is without merit.  "An appropriate award of compensatory education is 'relief designed to ensure that the student is appropriately educated within the means of the IDEA.'"  *Bd. of Educ. of Fayette Cnty., Ky., v. L.M.*, 478 F.3d 307, 316 (6th Cir. 2007) (quoting *Parents of Student W. v. Puyallup Sch. Dist.*, No. 3, 31 F.3d 1489, 1497 (5th Cir. 1994)).  Therefore, awarding compensatory education for the FAPE denial is appropriate.

A.W. argues that the SLRO erred in reducing the amount of compensatory education awarded to A.W.  The IHO awarded A.W. 234 hours but failed to articulate the basis for his award.  Therefore, the IHO award seems to be based on a mechanical formula.  A.W. correctly argues that an award of compensatory education based on a mechanical formula is not per se inappropriate, an hour-by-hour mechanical approach is disfavored and the appropriate way to determine an award for compensatory education is through a more flexible approach.  *See Reid ex rel Reid v. Dist. of Columbia*, 401 F.3d 516, 524 (D.C. Cir. 2005). Here, however, the IHO expressly stated that "the School and Parent agreed in their December 14 Settlement Agreement upon compensatory education at the rate of two hours per day.  Although there was no evidence to establish how the parties arrived at the amount of daily compensatory education, the IHO found that "compensatory education is an appropriate remedy to address these 117 days when the Student was excluded from School." (IHO Decision pg. 115).  The IHO gave two hours of compensatory education time for each day A.W. missed due to her exclusions from school, thus arriving at 234 hours.   The District

25

argues that the IHO's calculation of two hours per day missed was taken from the Settlement Agreement wherein the parties agreed to two hours per missed day. The District argues that such an application is exactly the kind of mechanical formula disfavored by the Courts. A.C. contends nothing in the administrative record supports such a conclusion.

The SLRO determined the IHO failed to articulate the basis for his calculation and therefore, it appeared to be derived from applying a mechanical formula. The SLRO further determined the IHO's formula failed to discount the first ten days of suspension, which are not considered to be a change of placement.

The SLRO stated "based on the facts of this case, there was insufficient evidence as to the amount of hours that would ensure that Student is appropriately educated within the meaning of IDEA." (SLRO page 48). Because the IHO failed to provide an evidentiary basis for his determination of compensatory hours, the SLRO looked to the amount of time the District used for its home instruction program, which was six hours a week of one on one home instruction, arriving at 125 hours.

The Court finds that, in the absence of an evidentiary basis for the IHO's compensatory education calculation, and because the IHO's calculation failed to discount the first ten days of suspension, the SLRO's substitution and reduction based on the District's own practice of affording six hours a week was not error and the Court affirms the SLRO's compensatory education award of 125 hours. The Court further relies on precedent requiring it defer to the educational expertise of the SLRO in determinations such as compensatory hours.

26

A.W. further argues that she should be awarded compensatory education for the period covered by her February 1, 2012 IEP because the IEP denied her a FAPE.  However, the Court has determined that A.W.'s 2012 IEP issues were resolved by the 2012 Settlement Agreement. Therefore, A.W. is not entitled to additional compensatory education arising from any alleged issues with the February 2012 IEP and the parties agreed to certain remedies, including compensatory education as outlined in the Settlement Agreement.

Therefore the Court affirms the SLRO's determination of 125 compensatory education hours.

**6.  Although the SLRO reversed the IHO's order refusing to enforce the Settlement Agreement, the SLRO erred in disregarding and giving no weight to the Settlement Agreement reached by the parties and the testimony concerning District personnel's ability to assess whether the Student's behaviors constitute social maladjustment and about how to proceed with respect to the Student's behaviors.  In addition, the SLRO gave undue weight to the Parent's expert witness' testimony and disregarded and gave no weight to the testimony of the District's expert witness on the issues of social maladjustment.  The SLRO's Decision is thus inconsistent with her own findings and contrary to the law and to the documentary record evidence and testimony adduced at trial.**

The District withdrew this Assignment of error, but reserved it depending on Defendant's arguments.

**7.  The SLRO erred by disregarding and giving no weight to the report and testimony of the District's expert witness, Dr. Sargent, and by affording undue and improper weight to the testimony of Parent's expert witness, Dr. Jensen.  In this respect the SLRO gave excessive and improper deference to the IHO's failure to give any weight at all to the testimony of the District's expert witness on any issues at all.  The SLRO's decision is contrary to law and the documentary record evidence and testimony adduced at trial.**

The District argues that the SLRO erred by disregarding and giving no weight to the District's expert witness, Dr. Sargent.  However, the SLRO did not err in deferring to the

IHO's credibility determination and the Court will not second guess that determination.

As previously stated, when reviewing the findings of both an IHO and a SLRO, the Court must defer to the SLRO's decision. *See Burlovich,* 208 F.3d at 567 (citing *Renner v. Bd. of Educ. of Pub. Sch. of City of Ann Arbor,* 208 F.3d 560, 641 (6th Cir.1999)). Additionally, while the Court must give the SLRO deference in matters requiring educational expertise, the Court will not "second guess" credibility determinations made by the IHO, who was best situated to assess the credibility of testifying witnesses. *B.H. v. W. Clermont Bd. of Educ.,* 788 F.Supp.2d 682, 693, (S.D.Ohio 2011) (citing *Bd. of Educ. of the City Sch. Dist. of the City of Cincinnati v. Wilhelmy,* 689 F.Supp.2d 970, 987 (S.D.Ohio 2010)).

Here, the IHO made a credibility determination and discredited the District's expert, Dr. Sargent. Under IDEA, the IHO has wide latitude in governing a due process hearing. Therefore, it is within the IHO's authority to make evidentiary rulings and decisions. *See Stancourt v. Worthington City Sch. Dist. Bd. of Educ.,* 164 Ohio App.3d 184, 205 (2005). The IHO is well within his discretion to give weight to certain experts' opinions and not to give weight to the opinion of a different expert. The Court is not in a position to second guess the IHO's credibility determinations and therefore, must give the determinations of the fact finder due deference. *See Stancourt v. Worthington City Sch. Dist. Bd. of Educ.,* 841 N.E.2d 812, 823 (Ohio App.Ct. 10th Dist., Oct. 27, 2005).

Therefore, the determination of the IHO and the SLRO to discredit Dr. Sargent and to weigh heavily on the expertise of Dr. Jensen is within the IHO's and the SLRO's discretion and this Court will give them deference.

**8.   The SLRO erred in considering evidence and making findings of fact beyond the 2-year time period permissible under IDEA and/or beyond the scope of the agreed-to Statement of Issues, and by failing to rule that the IHO erred in allowing the introduction of such evidence.**

The SLRO correctly concluded that the two-year statute of limitations is not an evidence rule; rather it is a claim bar, meaning a party cannot bring a claim outside the two-year limitation. §1415(f)(3)(C) states in pertinent part:

> parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for requesting such a hearing under this subchapter, in such time as the State law allows.

1415(f)(3)(C).

The statute is intended to limit when a claim can be brought, not what can be considered once a claim is brought.  Therefore, §1415(f)(3)(C) is not a rule of evidence that determines what can or cannot be considered, rather, it serves as a limitation dictating when a claim can be brought to court.  Additionally, the IHO is given latitude in conducting the due process hearing, and it is within the IHO's authority to make evidentiary rulings and decisions.  *See Crisp v. Scioto Residential Serv., Inc.,* Scioto App. No. 03CA2918, 2004-Ohio-6349, 2004 WL 2698436, at ¶ 14 (Generally speaking, "[a] hearing officer has broad discretion in accepting and rejecting evidence and in conducting the hearing in general.") (citing *Owens v. Adm. Ohio Bur. of Emp. Serv.* (1999), 135 Ohio App.3d 217, 220, 733 N.E.2d 628; *Nordonia Hills City School Dist. Bd. of Edn. v. Unemp. Comp. Bd. of Rev.* (1983), 11 Ohio App.3d 189, 190, 11 OBR 283, 463 N.E.2d 1276; *Stancourt v. Worthington City Sch. Dist. of Educ.*, 164 Ohio App. 3d 184, 205 (2005).  It was within the IHO's discretion to allow evidence to provide helpful background in his consideration of the claims

29

that did arise in the two-year limitation period.  Therefore, the Court affirms the IHO's

allowance of evidence outside the two-year period.

   **9.  The SLRO erred in failing to find that the IHO committed prejudicial error by
       bifurcating the hearing, resulting in undue delay in providing services to the
       Student and in the unnecessary and undue burden and expense upon the District.**

   The SLRO did not err when she determined that the IHO did not commit prejudicial error

by bifurcating the hearing.  The SLRO correctly reasoned that the determination to bifurcate

the hearing was within the IHO's powers.  Further, the bifurcation affected both parties

equally in terms of delay of services and undue expenses.  The District argues that it was not

only unfairly prejudiced because of undue expenses but also because there was delay in

determining what services they needed to provide to A.W.  Again, this was in the purview of

the IHO's determination and the Court affirms the IHO's decision to bifurcate.

## <u>Student's Assignments of Error</u>

   **1.  Assignment of Error 1: Due to an erroneous interpretation of the parties'
       Settlement Agreement and the relevant time period, the SLRO erred by finding
       that A.C. did not prove by a preponderance of the evidence that A.W.'s February
       1, 2012 IEP denied her a FAPE.**

       **a.  The SLRO's finding is based on a mistaken belief that A.C. amended her
           due process complaint to include claims for the time period between
           February 1, 2012 to August 27, 2012.**

   A.C. filed a Due Process Complaint in August of 2012 alleging the District failed to

provide a FAPE for A.W. when it incorrectly determined A.W. was ineligible for special

education services upon its reevaluation.  A.C.'s Due Process Complaint sought to enforce

her IEP and to develop and implement an IEP that met A.W.'s needs.  In December of 2012,

A.C. and the District entered into a Settlement Agreement wherein the parties agreed A.W. would continue to be eligible for special education services, that A.W. would remain in her current educational placement and that the District would retain a speech-language pathologist and behavioral specialist to assess A.W. The District further agreed to provide twenty-four hours of compensatory education and paid A.C.'s attorney fees. As a result, A.C. dismissed all claims asserted in the Complaint.

However, in the action before the IHO, A.C. challenged the District's failure to implement an individualized behavior program that met her needs under either the February 2012 or March 2013 IEPs. A.C. argued that the District failed to provide a FAPE because the District lacked sufficient behavioral intervention strategies reasonably calculated to allow A.W. to obtain an educational benefit. The IHO agreed with A.C. and determined the 2012 IEP failed to provide a FAPE. In so concluding, the IHO described A.W.'s numerous behavioral issues, suspensions and expulsions dating back to 2010 and included incidents occuring in the 2011-2012 school year. The SLRO overturned the IHO's finding insofar as it applied to any FAPE issues predating the filing of the August 2012 Due Process Complaint. The SLRO determined that the December 2012 Settlement Agreement resolved all claims arising before August 2012.

On October 14, 2015, the Court ordered the parties to produce the Due Process Complaint filed by A.C. on August, 27, 2012 because it was not a part of the administrative record. On October 19, 2015, the parties submitted the Due Process Complaint. After reviewing the August 27, 2012 Due Process Complaint, the Court finds that whether the February 1, 2012 IEP provided A.W. a FAPE was not an issue directly raised by A.C. Rather,

31

in the Due Process Complaint A.C. argued that the February 1, 2012 IEP should be enforced so that A.W. could fulfill her goals and objectives set forth in that IEP.  Notably, nowhere in the August 2012 Due Process Complaint does it allege that the February 1, 2012 IEP denied A.W. a FAPE.  Rather, the main claim set forth in the Due Process Complaint is the Spring 2012 reevaluation and determination that A.W. no longer qualified for services under IDEA.

A.C. agrees that the Settlement Agreement covered the time period running from February 1, 2012 to the filing of the August 2012 Due Process Complaint.  A.C. contends that the SLRO erroneously applied the Settlement Agreement to cover the time period from August 2012 to January 2013.  During this time period the February 2012 IEP was still in place, yet the Settlement Agreement expressly limits its applicability to claims arising before August 2012.  The IHO determined that the February 2012 IEP failed to provide A.W. a FAPE because her numerous misconduct violations, suspensions and expulsions clearly indicated A.W. was not progressing toward achieving her behavior goals set forth in the February 2012 IEP.  The SLRO reversed the IHO, finding that "the Settlement Agreement has impact concerning facts that preceded it and facts going forward.  Because it resolved all facts raised in Parent's August 2012 Complaint, it is reasonable to conclude that Parent's August 2012 Complaint included any issues parent had with prior IEPs and the provision of FAPE before that date and for the two years prior to that date." (SLRO decision pg 31).  While the SLRO determined that certain issues arising from A.W.'s removals were not subject to the Settlement Agreement, she concluded that the Settlement Agreement resolved FAPE issues concerning A.W.'s 2012 IEP.

The Court agrees with the reasoning of the SLRO that the Settlement Agreement

32

resolved FAPE issues arising from the February 2012 IEP.  Although the August 2012 Complaint does not include the claim that A.W.'s February 1, 2012 IEP denied her a FAPE, the language of the Settlement Agreement specifically refers to the settlement of  "all outstanding claims asserted by [A.W.] and Ms. Crosby in the Complaint," and the settlement agreement addressed A.C.'s desire to "develop an IEP that meets [A.W.'s] unique needs." The District agreed to implement recommended services by a behavioral specialist after an assessment of A.C. and to have a formal speech and language assessment of A.C. and implement any recommendations arising from the assessment.  Both would then be included in a modified IEP.   The Settlement Agreement included compensatory education hours, the development of a behavioral intervention plan and contained an agreement that A.C. stay in her current educational placement.

The SLRO determined that " because the Settlement Agreement resolved all issues prior to the filing of the original due process complaint on August 27, 2012, it was error for the IHO to find that the February 1, 2012 IEP did not provide FAPE." (SLRO page 42).  The SLRO defined the timeline at issue in the 2013 Due Process Complaint  from August 24, 2012, the date of the first Due Process Complaint, to March 11, 2013, the date of the second Due Process Complaint.  The Settlement Agreement contained the agreement of the parties that A.W.'s 2012 IEP would remain in effect through February of 2013, evidencing the parties intent that the Settlement Agreement resolved any issues A.C. had with the 2012 IEP.

A.C. asserts that the Settlement Agreement has no bearing on issues arising after the August 2012 Due Process Complaint as per the plain language of the Settlement Agreement. The SLRO acknowledged as much, holding that the terms of the Settlement Agreement

narrowed the scope of the FAPE issues to only those arising from the October suspension up until the filing of the March 2013 Due Process Complaint. Thus, the SLRO overturned the IHO's 2012 IEP determination insofar as it relied on issues arising prior to August 2012. The SLRO reviewed the post-August 2012 disciplinary actions determining the October and March expulsions denied A.W. a FAPE but held that Settlement Agreement resolved any generalized complaints on the adequacy of the 2012 IEP; particularly because the Settlement Agreement addressed A.C.'s FAPE concerns and expressly called for revisions to the IEP based on agreed upon behavioral and speech assessments.

Therefore, the Court affirms the decision of the SLRO that the Settlement Agreement resolved all issues concerning the February 2012 IEP, with the exceptions as noted.

### b. The February 1, 2012 IEP was not reasonably calculated to enable A.C. to receive an educational benefit and it therefore denied her a FAPE.

Because the Court agrees with the SLRO that the December 2012 Settlement Agreement resolved all FAPE issues prior to August 2012 as discussed above, this objection is moot.

### 2. Assignment of Error 4: The SLRO erred by reducing A.W.'s compensatory education award.

See Court's holding in discussing District's Assignment of Error 5.

### 3. Assignment of Error 3: The SLRO erred by failing to order Maple Heights to pay for an out-of-district placement for A.W.

Both the IHO and the SLRO determined that the District could provide A.W. a FAPE going forward and thus denied A.W.'s request to have the District fund A.W.'s out-of-district placement. Placement in a private school is not proper unless that placement provides, at a

34

minimum, "special education services in which the public school placement was deficient." *Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 522 (6th Cir. 2003). Additionally, a school is not required to take on such a substantial burden of funding private education if there is no evidence in the administrative record indicating that the school is unable to provide FAPE to a student "going forward." *Woods ex rel. Woods v. Northport Public Sch.*, 487 Fed. Appx. 968, 980 (6th Cir. 2012).

The SLRO correctly determined that the record does not support the assertion that the School is incapable of providing A.W. a FAPE going forward. Here, the IHO and SLRO declined to order private placement because the parents did not prove that the District was unable of providing a FAPE going forward. Rather, the SLRO determined that "the evidence shows that the District has the capability of offering Student an appropriate IEP and a meaningful educational program that complies with the procedural requirements of IDEA. There was evidence that she was capable of making progress in the District." (SLRO Decision page 52). The SLRO noted that A.C. was observed on many occasions to be focused on her work and was able to maintain her emotional stability. Because the parent did not prove by a preponderance of the evidence that the School was incapable of providing a FAPE going forward, the Court affirms the IHO and SLRO's denial of private placement.

**4. The SLRO erred by finding that the IHO misapplied the law of the "knowingly" requirement in IDEA's special circumstances provision.**

See District's Assignment of Error 1 & 2.

Therefore, for the foregoing reasons, the Court affirms the decision of the SLRO in all respects on all objections raised by the District and Parent.

IT IS SO ORDERED.

s/ Christopher A. Boyko
CHRISTOPHER A. BOYKO
United States District Judge

Dated:  June 27, 2016